## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

|  |  |
|---|---|
| VOIP-PAL.COM, INC.<br><br>                    Plaintiff,<br><br>       v.<br><br>APPLE, INC.,<br><br>                   Defendant. | CIVIL ACTION NO. 6:21-cv-670<br><br>JURY TRIAL DEMANDED |

## ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff VoIP-Pal.com, Inc. ("VoIP-Pal"), for its Complaint against Defendant Apple, Inc. ("Apple"), alleges as follows:

### THE PARTIES

1.      Plaintiff VoIP-Pal is a Nevada corporation with its principal place of business located at 7215 Bosque Boulevard, Waco, Texas 76710.  VoIP-Pal is registered to do business in the State of Texas.

2.      On information and belief, Defendant Apple is a California corporation with physical addresses in this District at 12545 Riata Vista Circle, Austin, Texas 78727; 12801 Delcour Drive, Austin, Texas 78727; and 3121 Palm 4 Way, Austin, Texas 78758.  Apple may be served with process through its registered agent, the CT Corp System, at 1999 Bryan St., Ste. 900 Dallas, Texas 75201-3136.  Apple is registered to do business in the State of Texas and has been since at least May 16, 1980.

3.      On information and belief, Apple regularly conducts and transacts business in the State of Texas, throughout the United States, and within this District, and as set forth below, has

committed and continues to commit, tortious acts of infringement within and outside the State of Texas and within this District.

## JURISDICTION AND VENUE

4.      This action is a civil action for patent infringement arising under the patent laws of the United States, Title 35, United States Code ("U.S.C.") §1 et seq., including 35 U.S.C. §§ 271 and 281-285.   This Court has exclusive subject matter jurisdiction over this case for patent infringement under 28 U.S.C. §§ 1331 and 1338.

5.      This Court has personal jurisdiction over Apple by virtue of its systematic and continuous contacts with this jurisdiction, as alleged herein, as well as because the injury to VoIP-Pal occurred in the State of Texas and the claim for relief possessed by VoIP-Pal against Apple for that injury arose in the State of Texas.   On information and belief, Apple has purposely availed itself of the privileges of conducting business within the State of Texas, such business including but not limited to: (i) at least a portion of the infringements alleged herein; (ii) purposefully and voluntarily placing one or more infringing products or services into the stream of commerce with the expectation that they will be purchased by consumers in this forum; or (iii) regularly transacting or soliciting business, engaging in other persistent courses of conduct, or deriving or attempting to derive substantial revenue and financial benefits from goods and services provided to individuals residing in the State of Texas and in this District.   Thus, Apple is subject to this Court's specific and general personal jurisdiction under due process and the Texas Long Arm Statute.

6.      Personal jurisdiction also exists specifically over Apple because Apple, directly or through subsidiaries or intermediaries (including customers, distributors, retailers, and others), subsidiaries, alter egos, and/or agents – ships, distributes, offers for sale, licenses, sells, imports, advertises, or markets in the State of Texas and in this District, one or more products or services

that infringe the patents-in-suit, as described particularly below.  Apple has purposefully and voluntarily placed one or more of its infringing products and/or services, as described below, into the stream of commerce with the awareness and/or intent that these products and/or services will be purchased or used by consumers in this District.  Apple has knowingly and purposefully shipped infringing products into and within this District through an established distribution channel.  These infringing products have been and continue to be purchased and used by consumers in this District.

7.      VoIP-Pal's claim for relief for patent infringement arises directly from the activities of Apple in this District.

8.      On information and belief, Apple, directly and/or through its customers has transacted business in this District and has committed acts of patent infringement in this District. By virtue of its offices in this District, Apple has a regular and established place of business in this District.  Thus, venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b).

## BACKGROUND OF THE TECHNOLOGY AND THE PATENTS-IN-SUIT

9.      United States Patent No. 8,630,234 (the "'234 patent") entitled "Mobile Gateway" was duly and legally issued by the United States Patent and Trademark Office on January 14, 2014 after full and fair examination.  A copy of the '234 patent is attached hereto as Exhibit 1.

10.      United States Patent No. 10,880,721 (the "'721 patent") entitled "Mobile Gateway" was duly and legally issued by the United States Patent and Trademark Office on December 29, 2020 after full and fair examination.  A copy of the '721 patent is attached hereto as Exhibit 2.

11.      The '234 and '721 patents are referred to in this Complaint as the "Patents-in-Suit".

12.    VoIP-Pal is the sole owner and assignee of the entire right title and interest in the Patents-in-Suit and has the right to sue and recover damages for any current or past infringement of the Patents-in-Suit.

13.    The inventions of the Patents-in-Suit originated from breakthrough work and development in the internet protocol communications field.

14.    VoIP-Pal has provided significant improvements to communications technology by the invention of novel methods, processes and apparatuses that facilitate communications across and between internet protocol based communication systems and other networks, such as internally controlled systems and external networks (e.g., across private networks and between private networks and public networks), including providing access to and routing through internet protocol based communication systems.

15.    The earliest telephone systems to receive public use within the United States involved a telephone directly connected to a human operator. A portion of the phone rested on a mechanical hook such that the operator was signaled when the portion was lifted from the hook. A caller would then say the name of the person they wished to call to the operator. If the callee was connected to the same telephone switch board the operator would physically pull out a cable associated with the caller's phone and plug the cable into a socket associated with the callee's telephone. If the callee was associated with a different switchboard, and thus out of reach of the operator, a second operator would be involved to bridge the gap to the appropriate switchboard. While initially very effective compared to no telephone service, this structure quickly proved error prone (operators would connect the wrong party) and limiting to the number of possible telephones because of the physical limits of switchboards and cable to be pulled. This basic system corresponds to the introduction of a Plain Old Telephone Service ("POTS") connection to the

operator. In these configurations, there was a dedicated, point-to-point electrical connection between the caller and the callee.

16.     Rotary dialing eventually was introduced, beginning at around the turn of the 20th century, where a rotary disk was marked with numbers from zero to nine. A caller would spin the wheel and a mechanical device in the telephone would cause a sequence of electrical pulses to be sent to the network corresponding to the digit dialed, for example, four pulses would be sent for the number four. Rather than speaking to a human operator, an electric device would count the pulses and begin to route a call once an appropriate and valid sequence of digits was dialed by the caller. This advancement improved reliability of call routing and reduced the time required to initiate a call. But, even so, there was a dedicated, point-to-point electrical connection between the caller and the callee.  As multiple companies entered the market of telephone service and the number of customers increased, an issue emerged where a caller would be a customer of one telephone company and the callee would be a customer of another. The solution that emerged to this problem was to introduce trunk lines connecting one company to another.

17.     Eventually, as the number of companies continued to increase and telephone services spread over much larger geographic areas, the notion of a Public Switched Telephone Network ("PSTN") emerged. The term derives from the notion, at least in part, that the dedicated wires used to connect the caller and callee were "circuit-switched" to connect the two parties. The PSTN developed gradually into the middle of the 20th century, still built around the notion of rotary dialing and POTS connections to the individual telephones. These calls involved analog communications over circuit-switched electrical connections. A circuit-switched network involves assigning dedicated resources, such as switch settings and specific wires, to establish a link from

the caller to the callee. While the call is ongoing, these resources cannot be used for any other communications.

18.     The next important advancement for consumer telephone service, introduced broadly during the second half of the 20th century, was the introduction of push-button telephones. With such telephones the rotary dial was replaced by a matrix of buttons, each labeled with a digit from zero through nine along with the additions of '*' and '#'. The underlying signaling technology was called dual-tone multiple-frequency ("DTMF") and involves two different audible tones being sent simultaneously from the telephone into the telephone network. A receiver within the network decoded these tones and formed them into a sequence of digits indicating the number of the callee.

19.     Around this same time a scheme for international telephone addressing was introduced, with a numeric protocol for identifying one country from another and providing country-specific routing within the destination country. The E.164 standard now documents how a caller anywhere in the world, for example, in Ann Arbor, Michigan, can identify a telephone number at any other location, such as Avignon, France. While many of these advances, such as DTMF dialing and automated international routing, may have been originally introduced via *ad hoc* methods, eventually they required multiple parties (companies and governments) to agree on protocols to enable wide-spread reliable use and inter-operability among different telephone communications networks. Even with all these advances, the systems still relied on circuit-switched technology that dedicated resources between the caller and the callee for the duration of a call. The move to take human operators out of the loop, with the introduction of rotary dialing, combined with the fast increase in demand for telephone services throughout the 20th century, resulted in the development of automated telephone switches. These devices comprised a set of

input ports, each dedicated to, and associated with a specific caller, and output ports, each capable of being associated with a callee. A small local telephone system may have had a single switch while a larger service would use a large number of switches that were connected to each other. A switch from a local service provider would be connected to a trunk line which then connected to an input switch of another service provider. These switches originally supported analog voice calls initiated via rotary dialing and dedicating input and output ports as well as physical wires for each circuit-switched call.

20.     Eventually analog voice services were replaced within the network with digital voice. Digital voice is communicated using a sequence of chunks (or packets) of data. This advancement allowed physical resources to be shared among multiple calls over short bursts of time. For example, a physical wire can move a packet for one call at a specific instance in time and then move a packet for a totally different call subsequently, only to later return to transfer a new packet for the original call. This advance is called packet-switched communications and provided an important increase in network reliability and efficiency while driving down the cost. However, in most situations throughout the 20th century (and often still today), the connection to the end user's physical telephone is analog. While network switches operate via digital circuitry, and often comprise programmable processors executing software, they tend to be dedicated special-purpose devices. The conversion between analog and digital encoding is typically done at the point where the PSTN network switch connects to the POTS handset, for example, at a device called a Class-5 telephone switch, which connects the customer POTS handset to the PSTN network of a service provider's central office.

21.     The Internet became important to consumers, via broad deployment, during the late 1980's and early 1990's. Eventually available bandwidth and reliability increased to the point

where pioneers began to experiment with techniques to carry voice communications over the Internet. These early efforts began to focus on techniques called Voice Over Internet Protocol (VOIP) and session initiation protocol (SIP). VOIP provided a consistent set of protocols and mechanisms for moving digital voice packets between two callers using the Internet rather than existing PSTN networks. SIP provided a mechanism for establishing and terminating communication sessions such as calls between users of a VOIP service. For example, a callee could register with a VOIP service so that an identifier (such as their name, email address or a nickname) could be associated with the computer to which they are logged in. Eventually VOIP services increased to provide interoperability with the existing PSTN services. For example, the company Skype began to allow a user to call a PSTN number using a feature marketed as "Skype out". However, the user was required to explicitly classify the call as a PSTN call by specifying a real physical telephone number. In this case the VOIP system had to include a gateway to bridge from the VOIP network to the PSTN network in order to route to the physical telephone. Calls that used a proprietary non-PSTN user identifier such as an email or nickname remained within the VOIP network and were not routed to the PSTN network to a POTS telephone.

22.     The advent of digital cellular networks in the 1990's allowed customers to physically move their mobile phones from one location to another and enabled convenient mobile calling. However, despite the increasing popularity of the Internet and the development of Internet-based VOIP services such as Skype, mobile phone users were forced to use conventional calling processes to place calls over the then-existing mobile phone and PSTN communication infrastructure. Also, mobile phone users often had to pay roaming charges for calls if they were not located in their home area or incurred significant costs to place long-distance calls if the called party was not local.  One technique developed for avoiding the long distance charges charged by

mobile telephone service providers was to use a calling card to place a call to a local telephone number or to a less-expensive phone number (such as a toll-free number), but this technique was cumbersome and complex as it required the user to dial a special set of numbers or codes. However, the Patents-in-Suit disclose and claim a distinct manner of mobile call routing.

23.    Digifonica, a wholly owned subsidiary of patent owner VoIP-Pal, starting in 2004 eventually came to employ over a dozen top professionals (e.g., software developers, system administrators, QA/test analysts) including three Ph.D.'s with engineering backgrounds, to develop innovative software solutions for communications. Digifonica spent over $15,000,000 researching, developing, and testing a communication solution capable of seamlessly integrating a private voice-over-IP ("VoIP") communication network with an external network (i.e., the "public switched telephone network" or "PSTN"), by bridging the disparate protocols, destination identifiers and addressing schemes used in the two networks.  Furthermore, Digifonica's system optimized the choice of communication infrastructure to be used for any given call based on the location of the caller and/or callee.  Digifonica's system chose the optimal infrastructure to route both calls placed over cellular and PSTN networks or placed via internet protocol networks.  By the mid-2000's, Digifonica had successfully tested intra- and inter-network communications (i.e., communications within the private Digifonica system and between the Digifonica system and the PSTN) by implementing high-capacity communication nodes across three geographic regions, including actual working communication nodes in Vancouver (Canada) and London (UK). Digifonica's R&D efforts led to a number of patent grants, including the Patents-in-Suit.

24.    The Patents-in-Suit describe novel systems, apparatuses and methods for providing an access code to roaming mobile communication devices such as smartphones, to enable access

to suitable communication routing infrastructure, wherein the selection of the communication channel for a call can be optimized based on the calling device's current location.

## OVERVIEW OF THE ACCUSED INSTRUMENTALITIES

25.     Each of the instrumentalities described in this Complaint made, used, sold, offered for sale, and/or imported by Apple comprises systems, devices and computer-executable program code relating to and supporting communications using devices, computers, servers, systems and methods used by, operated by and performed by Apple.

26.     Apple manufacturers, supports, and operates a communications platform (the "Apple Calling System") that includes an Apple server infrastructure and Apple desktop computers, laptops, tablets, smartphones and mobile devices, and software applications running on such devices.  The Apple server infrastructure relays data packets between users' registered devices.

27.     In the Apple Calling System, users of the desktop computers, laptops, tablets, smartphones, and mobile devices can send messages including text, images, video, and audio using the software applications running on such devices, to other users which may be another Apple subscriber or a non-subscriber.  Apple iMessage is a messaging service for iOS and iPadOS devices, Apple Watch, and Mac computers.  iMessage supports text and attachments such as photos, contacts, locations, links, and attachments directly on to a message. Messages appear on all of a user's registered devices so that a conversation can be continued from any of the user's devices.  iMessage makes extensive use of the Apple Push Notification service (APNs).  When a user turns on iMessage on a device, the device generates encryption and signing pairs of keys for use with the APNs.  The private keys are saved in the device's keychain and only available after

first unlock.  The public keys are sent to the Apple Identity Service (IDS), where they are associated with the user's phone number or email address, along with the device's APNs address.

28.     Users start a new iMessage conversation by entering an address or name.  If they enter a phone number or email address, the device contacts the Apple Identity Service (IDS) to retrieve the public keys and APNs addresses for all of the devices associated with the addressee. If the user enters a name, the device first uses the user's Contacts app to gather the phone numbers and email addresses associated with that name and then gets the public keys and APNs addresses from IDS.

29.     In the Apple Calling System, users of the desktop computers, laptops, tablets, smartphones, and mobile devices can also make voice and video calls using the software applications running on such devices. Apple FaceTime is Apple's video and audio calling service. Like iMessage, FaceTime also makes extensive use of the Apple Push Notification service (APNs). FaceTime uses the APNs to establish an initial connection to an Apple user's registered devices. The initial FaceTime connection is made through the Apple server infrastructure, which can also be used to carry a FaceTime call if necessary.  For example, a user's Apple mobile telephone uses APNs notifications and Session Traversal Utilities for NAT (STUN) messages over a relayed connection through the Apple server infrastructure in order to verify identity certificates and establish a shared secret for each session associated with the FaceTime call.  The shared secret is used to derive session keys for media channels streamed using the Secure Real-time Transport Protocol (SRTP).  After initial connection and security setup, FaceTime can relay the FaceTime call through the Apple server infrastructure or use STUN and Internet Connectivity Establishment (ICE) to establish a peer-to-peer connection between devices, if possible.

30.     The Apple Calling System enables mobile telephone or device roaming.  The Apple Calling System produces an access code identifying a communication channel useable by the mobile telephone or device to initiate a call to a callee using the channel.  In the Apple Calling System, the access code is based on a location identifier and/or based on a location pre-associated with the mobile telephone or device.

31.     The Apple Calling System is referred to in this Complaint as the Accused Instrumentalities.

**COUNT 1**
**INFRINGEMENT OF U. S. PATENT NO. 8,630,234**

32.     Paragraphs 1 through 31 are incorporated by reference as if fully stated in this Count.

33.     Apple, either alone or in conjunction with others, has infringed and continues to infringe, both directly and indirectly, one or more claims of the '234 patent, including at least exemplary claim 20, under 35 U.S.C. § 271, either literally and/or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States at least certain methods, apparatuses, products and services used for communication, including, without limitation, the Accused Instrumentalities.

34.     For example, Apple infringes exemplary claim 20 of the '234 patent by making, using, offering to sell, selling, and/or importing into the United States at least the Accused Instrumentalities as detailed in Exhibit 3 to this Complaint.

35.     On information and belief, Apple has had knowledge of the '234 patent since at least January 14, 2014 when the '234 patent issued.  After acquiring that knowledge, Apple infringed the '234 patent and in doing so, it knew, or should have known, that its conduct amounted to infringement of the '234 patent.  Since the issuance of the '234 patent, the parties have engaged

in numerous communications regarding VoIP-Pal's patent portfolio, including the '234 patent. VoIP-Pal explained the value of its patent portfolio to Apple and offered to license its patents in good faith. Apple reviewed VoIP-Pal's patent portfolio and advised VoIP-Pal that it was not interested in taking a license. Apple, however, failed to provide VoIP-Pal any basis as to why it does not need license despite being subjectively aware of the risk that its conduct constituted infringement.

36.     Alternatively, Apple has had knowledge of the '234 patent since at least November 13, 2015 based on a letter that VoIP-Pal sent Apple notifying Apple of the '234 patent. After acquiring that knowledge, Apple infringed the '234 patent and in doing so, it knew, or should have known, that its conduct amounted to infringement of the '234 patent. Since that time, Apple and VoIP-Pal have engaged in numerous communications regarding VoIP-Pal's patent portfolio, including the '234 patent. The parties have been engaged in multiple litigations and/or post-issuance proceedings before the Patent Trial and Appeal Board regarding VoIP-Pal's patents since February 9, 2016. The parties have also engaged in multiple settlement discussions concerning VoIP-Pal's patent portfolio, including the '234 patent. Through these actions, Apple has acquired intimate knowledge of VoIP-Pal's patent portfolio and its infringement of that portfolio.

37.     Alternatively, Apple has had knowledge of the '234 patent and its infringement of the '234 patent based at least on the filing of this Complaint.

38.     Despite its knowledge and notice of the '234 patent as of at least the filing of this Complaint, Apple has continued to make, use, sell, offer to sell, and/or import the Accused Instrumentalities in the United States in a manner that infringes the '234 patent. Apple knew or should have known that its actions constituted infringement of the '234 patent. Upon information and belief, Apple has failed to take adequate steps to avoid infringing the '234 patent, despite

having been on notice of and lacking permission to practice the '234 patent.  Upon information

and belief, Apple will continue to reap significant revenues and savings based on its infringement

of the '234 patent.  Accordingly, Apple's infringement has been and continues to be willful.

39.     Apple has induced infringement, and continues to induce infringement, of one or

more claims of the '234 patent under 35 U.S.C. § 271(b).  Apple actively, knowingly, and

intentionally induced, and continues to actively, knowingly and intentionally induce infringement

of the '234 patent by: making, using, offering for sale, selling, importing, or otherwise making

available and/or supplying the Accused Instrumentalities; with the knowledge and specific intent

that third parties will use the Accused Instrumentalities supplied by Apple to infringe the '234

patent; and with the knowledge and specific intent to encourage and facilitate third party

infringement through the dissemination of the Accused Instrumentalities and/or the creation and

dissemination of promotional and marketing materials, supporting materials, instructions, product

manuals, and/or technical information related to the Accused Instrumentalities.

40.     Apple specifically intended and was aware that the ordinary and customary use of

the Accused Instrumentalities would infringe the '234 patent.  For example, Apple makes, offers

for sale, sells, uses, imports, makes available, and/or provides the Accused Instrumentalities,

which, when used in their ordinary and customary manner as intended by Apple, infringe one or

more claims of the '234 patent, including at least exemplary claim 20.  Upon information and

belief, Apple further provides product manuals and other technical information that cause Apple

customers and other third parties to use and to operate the Accused Instrumentalities for their

ordinary and customary use.  Apple customers and other third parties have directly infringed the

'234 patent, including at least exemplary claim 20, through the normal and customary use of the

Accused Instrumentalities.  By providing network infrastructure, network services, and device

configurations for enabling the Accused Instrumentalities, and instruction and training to customers and other third parties on how to use the Accused Instrumentalities in an infringing manner, Apple specifically intended to induce infringement of the '234 patent, including at least exemplary claim 20.  Apple accordingly has induced and continues to induce Apple customers and other users of the Accused Instrumentalities in their ordinary and customary way to infringe the '234 patent, knowing, or at least being willful blind to the fact, that such use constitutes infringement of the '234 patent.

41.     Apple has contributed and continues to contribute to the infringement by others, including its customers, of the '234 patent under 35 U.S.C. § 271(c) by, among other things, making, using, selling, offering for sale within the United States and/or importing into the United States the Accused Instrumentalities for use in practicing the patented inventions of the '234 patent, knowing that the Accused Instrumentalities and components are especially made or adapted for use in infringement of the '234 patent, embody a material part of the inventions claimed in the '234 patent, and are not staple articles of commerce suitable for substantial non-infringing use. Apple's customers directly infringe the '234 patent by using the Accused Instrumentalities.

42.     VoIP-Pal has been and continues to be damaged by Apple's infringement of the '234 patent.

43.     Apple's conduct in infringing the '234 patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

## COUNT 2
## INFRINGEMENT OF U. S. PATENT NO. 10,880,721

44.     Paragraphs 1 through 43 are incorporated by reference as if fully stated in this Count.

45.     Apple, either alone or in conjunction with others, has infringed and continues to infringe, both directly and indirectly, one or more claims of the '721 patent, including at least exemplary claim 38, under 35 U.S.C. § 271, either literally and/or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States at least certain methods, apparatuses, products and services used for communication, including, without limitation, the Accused Instrumentalities.

46.     For example, Apple infringes exemplary claim 38 of the '721 patent by making, using, offering to sell, selling, and/or importing into the United States at least the Accused Instrumentalities as detailed in Exhibit 4 to this Complaint.

47.     On information and belief, Apple has had knowledge of the application that led to the '721 patent since at least November 13, 2015 based on a letter that VoIP-Pal sent Apple notifying Apple of the application that led to the '721 patent.  After acquiring that knowledge, Apple infringed the '721 patent and in doing so, it knew, or should have known, that its conduct amounted to infringement of the '721 patent.  Since that time, the parties have engaged in numerous communications regarding VoIP-Pal's patent portfolio, including the application that led to the '721 patent.  VoIP-Pal explained the value of its patent portfolio to Apple and offered to license its patents in good faith.  Apple reviewed VoIP-Pal's patent portfolio and advised VoIP-Pal that it was not interested in taking a license.  Apple, however, failed to provide VoIP-Pal any basis as to why it does not need license despite being subjectively aware of the risk that its conduct constituted infringement.

48.     On information and belief, Apple has had knowledge of the '721 patent since at least December 29, 2020 when the '721 patent issued.  After acquiring that knowledge, Apple infringed the '721 patent and in doing so, it knew, or should have known, that its conduct amounted

to infringement of the '721 patent. Since the issuance of the '721 patent, Apple and VoIP-Pal have engaged in numerous communications regarding VoIP-Pal's patent portfolio, including the '721 patent. The parties have been engaged in multiple litigations and/or post-issuance proceedings before the Patent Trial and Appeal Board regarding VoIP-Pal's patents since February 9, 2016. The parties have also engaged in multiple settlement discussions concerning VoIP-Pal's patent portfolio, including the '721 patent. Through these actions, Apple has acquired intimate knowledge of VoIP-Pal's patent portfolio and its infringement of that portfolio.

49.    Alternatively, Apple has had knowledge of Apple has had knowledge of its infringement of the '721 patent based at least on the filing of this Complaint.

50.    Despite its knowledge and notice of the '721 patent as of at least the filing of this Complaint, Apple has continued to make, use, sell, offer to sell, and/or import the Accused Instrumentalities in the United States in a manner that infringes the '721 patent. Apple knew or should have known that its actions constituted infringement of the '721 patent. Upon information and belief, Apple has failed to take adequate steps to avoid infringing the '721 patent, despite having been on notice of and lacking permission to practice the '721 patent. Upon information and belief, Apple will continue to reap significant revenues and savings based on its infringement of the '721 patent. Accordingly, Apple's infringement has been and continues to be willful.

51.    Apple has induced infringement, and continues to induce infringement, of one or more claims of the '721 patent under 35 U.S.C. § 271(b). Apple actively, knowingly, and intentionally induced, and continues to actively, knowingly and intentionally induce infringement of the '721 patent by: making, offering for sale, selling, importing, and/or otherwise making available and/or supplying the Accused Instrumentalities; with the knowledge and specific intent that third parties will use the Accused Instrumentalities supplied by Apple to infringe the '721

patent; and with the knowledge and specific intent to encourage and facilitate third party infringement through the dissemination of the Accused Instrumentalities and/or the creation and dissemination of promotional and marketing materials, supporting materials, instructions, product manuals, and/or technical information related to the Accused Instrumentalities.

52.     Apple specifically intended and was aware that the ordinary and customary use of the Accused Instrumentalities would infringe the '721 patent.  For example, Apple makes, sells, offers for sale, uses, imports, makes available, and/or provides the Accused Instrumentalities, which, when used in their ordinary and customary manner as intended by Apple, infringe one or more claims of the '721 patent, including at least exemplary claim 38.  Upon information and belief, Apple further provides product manuals and other technical information that cause Apple customers and other third parties to use and to operate the Accused Instrumentalities for their ordinary and customary use.  Apple customers and other third parties have directly infringed the '721 patent, including at least exemplary claim 38, through the normal and customary use of the Accused Instrumentalities.  By providing network infrastructure, network services, and device configurations for enabling the Accused Instrumentalities, and instruction and training to customers and other third parties on how to use the Accused Instrumentalities in an infringing manner, Apple specifically intended to induce infringement of the '721 patent, including at least exemplary claim 38.  Apple accordingly has induced and continues to induce Apple customers and other users of the Accused Instrumentalities in their ordinary and customary way to infringe the '721 patent, knowing, or at least being willful blind to the fact, that such use constitutes infringement of the '721 patent.

53.     Apple has contributed and continues to contribute to the infringement by others, including its customers, of the '721 patent under 35 U.S.C. § 271(c) by, among other things,

making, using, selling, offering for sale within the United States and/or importing into the United States the Accused Instrumentalities for use in practicing the patented inventions of the '721 patent, knowing that the Accused Instrumentalities and components are especially made or adapted for use in infringement of the '721 patent, embody a material part of the inventions claimed in the '721 patent, and are not staple articles of commerce suitable for substantial non-infringing use. Apple's customers directly infringe the '721 patent by using the Accused Instrumentalities.

54.     VoIP-Pal has been and continues to be damaged by Apple's infringement of the '721 patent.

55.     Apple's conduct in infringing the '721 patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

## DEMAND FOR JURY TRIAL

Under Rule 38 of the Federal Rules of Civil Procedure and Local Rule 38(a), VoIP-Pal demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, VoIP-Pal prays for the following relief:

a)     A judgment and order that Apple has directly infringed (either literally or under the doctrine of equivalents) and/or induced the infringement of the patents-in-suit;

b)     A judgment and order permanently enjoining Apple, its respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns and any other person(s) in active concert or participation with Apple from directly infringing the patents-in-suit for the full term of the patents-in-suit;

c)     A judgement that the infringement of the patents-in-suit by Apple has been willful;

d)      A judgment and order requiring Apple to pay VoIP-Pal an award of damages under 35 U.S.C. § 284, adequate to compensate VoIP-Pal for Apple's past infringement, but in no event less than a reasonable royalty, including enhanced damages as provided by 35 U.S.C. § 284, and supplemental damages for any continuing post-verdict infringement up until entry of the final judgment with an accounting, as needed, as well as damages for any continuing or future infringement up to and including the date that Apple is finally and permanently enjoined from further infringement;

e)      A judgment and order requiring that in the event a permanent injunction preventing future acts of infringement is not granted, that VoIP-Pal be awarded a compulsory ongoing licensing fee;

f)      A judgment and order that this action be found an exceptional case pursuant to 35 U.S.C. § 285, entitling VoIP-Pal to an award of all costs of this action, including attorneys' fees and interest;

g)      A judgment and order requiring Apple to pay VoIP-Pal the costs of this action;

h)      A judgment and order requiring Apple to pay VoIP-Pal pre-judgment and post-judgment interest on the damages award; and

i)      Such other and further relief as the Court deems just and equitable.

Dated: June 25, 2021

Respectfully submitted,


By: /s/Lewis E. Hudnell, III
Lewis E. Hudnell, III
lewis@hudnelllaw.com
Nicolas S. Gikkas
nick@hudnelllaw.com
Hudnell Law Group P.C.
800 W. El Camino Real Suite 180

Mountain View, California 94040
T: 650.564.3698
F: 347.772.3034

**ATTORNEYS FOR PLAINTIFF**
**VOIP-PAL.COM, INC.**